2010 Ark. App. 250

**Jeffrey Scott WRIGHT, Appellant**

v.

**Amy Lynn WRIGHT, Appellee.**

**No. CA 09–156.**

Court of Appeals of Arkansas.

March 17, 2010.

Brian Thomas Burke, Bentonville, for Appellant.

Johnnie Kay Emberton Rhoads, Rogers, for Appellee.

LARRY D. VAUGHT, Chief Judge.

Jeffrey Scott Wright appeals from a divorce decree and argues five points for reversal: 1) the trial court abused its discretion in calculating his income for the purposes of setting child support; 2) the trial court erred in setting the amount and duration of his child-support obligation; 3) the trial court erred in making an unequal distribution of marital property without proper explanation; 4) the trial court erred by treating the parties' University of Arkansas football tickets as marital property; and 5) the trial court abused its discretion in awarding attorney's fees and expert witness fees to appellee Amy Lynn Wright. We affirm in part and reverse and remand in part.

An initial complaint for divorce was filed on November 28, 2006. On January 7, 2008, appellee filed a complaint for separate maintenance. Appellant timely answered on May 14, 2008, and filed a counterclaim for divorce (on the ground of eighteen-month, continuous separation). The parties were married on June 2, 1990. At that time, appellant was an employee of Sam's Club. The parties relocated several times over the next few years before returning to Arkansas in 2002. In 2005, appellant began a new career as a co-owner of a car service, Pinnacle Car Service, Inc. (PCS). In addition to being employed by PCS, he later acquired 100% ownership in the company. The parties have three minor children—Jordan, Austin, and Alexandra—who (by agreement and order) were placed in appellee's custody.[1]

A temporary hearing was held in the matter on January 24, 2008, after which appellant was ordered to pay appellee $4000 per month as temporary child support and spousal support. The court further ordered the sale of both the marital residence and residential lot. Appellee was ordered to seek employment and to contribute financially to the household expenses. After the residence was sold, appellant filed a petition to modify his support obligations. His argument was twofold. He claimed that appellee's relocation to another, less expensive, home in the same subdivision and her lack of effort in finding employment (and failure to respond to discovery) justified a review of the parties' relative financial positions. The trial court agreed and conducted a hearing in the matter on July 29, 2008. The trial court found that appellee had done little to secure meaningful employment and that her monthly living expenses could be reduced by $1400. Based on these findings the court reduced appellant's temporary support obligations to $2600 per month.

On September 25, 2008, a two-day trial commenced. Appellant presented—by stipulation—a report prepared by his expert witness, Cheryl Shuffield, C.P.A., that found appellant's company had no value. The report took into account the value and depreciation associated with the company's assets. However, the report included a $19,505 downward adjustment to depreciation claimed by PCS in 2006 and 2007. This adjustment was made to account for the difference between "book depreciation" and "actual decline in value." During trial, appellant testified that PCS's performance during 2007 was the best indicator of its financial condition and urged the court to set his child-support and alimony obligations based on his net 2007 W–2 income

---

1. Appellant was awarded visitation in accordance with a court-ordered visitation sched-ule, and the custody rulings are not at issue in this appeal.

of $34,928.75. Appellant admitted that he had taken unreported tips from working at PCS and that he had pledged a PCS asset as collateral for a piece of real property purchased by his girlfriend. He also noted that his primary automobile was in the name of PCS.

In response, appellee presented the testimony of Jerry Jackson, an enrolled agent, who testified that depreciation should be ignored for the purposes of determining a person's true "spendable" income. Following this model of income determination, Jackson prepared a mock 2007 federal tax return for appellant that showed appellant's net income for 2007 was $104,464. On examination, Jackson admitted that he was not familiar with Administrative Order Number 10, and as such he was not aware of the order's mandate relating to depreciation. There was also testimony from Connie French, a former employee of PCS, who claimed that appellant was in the habit of keeping and not reporting, not only his own cash tips, but also the tips of other drivers.

Appellee testified that she had worked in a few part-time jobs following appellant's graduation from college, but she left the workforce when the parties began having children. She stated that she was now re-entering the workforce, approximately twelve years after having been last employed. Appellant and appellee offered near mirror testimony of the parties' marital property and the property's value. She disputed only the net worth of the parties' household furnishings, arguing that they were not worth the $50,000 claimed by appellant, and the valuation of PCS provided by expert Shuffield.

The decree of divorce was entered on October 23, 2008. The trial court divided the parties' marital property (which included setting aside the stock of PCS in exchange for one-half the value of PCS,

which it determined to be not more than $16,100). The trial court also adopted Jackson's method of calculating appellant's income and set child support accordingly. Finally, the court ordered appellant to pay alimony in the amount of $1762.11 per month for eight years. This appeal followed.

For his first point on appeal, appellant argues that the trial court erred in its income calculation for purposes of setting child support. He claims that the court should have used only his 2007 tax return in calculating his income; the court should have considered his claimed depreciation in determining his net income; and the court erred in imputing income to him that was not reflected on his tax returns.

Our standard of review for an appeal from a child-support order is de novo, and we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Hardy v. Wilbourne*, 370 Ark. 359, 259 S.W.3d 405 (2007). In reviewing a circuit court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.* at 364, 259 S.W.3d at 409. However, a circuit court's conclusion of law is given no deference on appeal. *Id.*, 259 S.W.3d at 409.

In determining an appropriate amount of child support, courts are to refer to the family support chart contained in our Administrive Order Number 10. Ark.Code Ann. § 9–12–312(a)(2) (Repl.2009). The family support chart provides a means of calculating child support based on the payor's net income. Administrative Order Number 10 defines income as "any form of payment, periodic or otherwise, due to an individual, regardless of source, including wages, salaries, commissions, bonuses, workers' compensation, disability, pay-

ments pursuant to a pension or retirement program, and interest less proper deductions[.]" Administrative Order No. 10, (II). It is well established that this definition of income is broadly construed, intended to encompass the widest range of potential income sources. *Davis v. Office of Child Support Enforcement,* 341 Ark. 349, 20 S.W.3d 273 (2000); *White v. White,* 95 Ark.App. 274, 236 S.W.3d 540 (2006). The administrative order also states that

> [f]or self-employed payors, support shall be calculated based on the last two years' federal and state income tax returns and the quarterly estimates for the current year. A self-employed payor's income should include contributions made to retirement plans, alimony paid, and self-employed health insurance paid; this figure appears on line 22 of the current federal income tax form. Depreciation should be allowed as a deduction only to the extent that it reflects actual decrease in value of an asset. Also the court shall consider the amount the payor is capable of earning or net worth approach based on property, lifestyle, etc.

Administrative Order No. 10, (III)(c).

Seemingly, this order confusingly calls for both a two-year, income-tax method and a net-worth approach to calculating income. However, in *Tucker v. Office of Child Support Enforcement,* clarification was provided as to when the court should proceed with the income-tax method of calculation and when it should use a net-worth approach:

> [W]e do recognize that a clarification of the procedure for determining child support by using the net-worth method will provide guidance to the bench and bar in future cases. Pursuant to Administrative Order No. 10, Section III(c), for self-employed payors, the circuit court should first consider the last two years' federal and state income tax returns and the quarterly estimates for the current year. A self-employed payor's income should include contributions made to retirement plans, alimony paid, and self-employed insurance paid. Depreciation should be allowed only to the extent that it reflects actual decrease in value of an asset.

> If the circuit court determines that the tax returns are unreliable, then it shall make specific findings explaining the basis of its determination. The circuit court shall then proceed using the net-worth method. The circuit court shall establish a beginning net worth at the start of the relevant period and an ending net worth at the end of the period, considering living expenses and allowable deductions for the same period. Additionally, the circuit court shall consider the following factors: (1) the impact of inflation or deflation on the payor's net worth; (2) liquidity of the payor's assets; (3) the payor's cash flow; (4) the payor's current and long-term financial obligations; (5) the payor's lifestyle; and (6) any other relevant factors. After determining the payor's disposable income, the circuit court shall calculate child support in accordance with the child-support guidelines.

368 Ark. 481, 489–90, 247 S.W.3d 485, 492 (2007).

■ Based on our reading of the developed case law and the administrative mandates relating to child-support calculation, we are of the opinion that in order to properly determine the income of a self-employed child-support payor, a trial court must first consider the past two years of tax returns, and quarterly estimates for the current year, allowing depreciation as a deduction if it reflects the actual decrease in value of an asset. Then, if the

trial court believes that the tax returns are unreliable, the trial court must make specific findings to support that determination. After doing so, the trial court can then proceed to determine a child-support payor's income by using the net-worth method.

In this case, the trial court crafted a hybrid approach to determine appellant's income. The foundation of the trial court's income finding was a "mock" income tax return that failed to account for any sort of depreciation in its calculation. The expert who prepared the numbers admitted that he disregarded depreciation altogether and was not aware of and had never considered the boundaries of Administrative Order Number 10. In essence, the trial court accepted an income determination that used only one year of tax returns and then proceeded with a sort of net-worth approach. This hybrid was clearly erroneous. As such, we reverse and remand this case with instructions to follow the income-calculation method we have outlined in this opinion. Because the ultimate income determination impacts both the imputed-income and alimony determinations, we reverse and remand on these two points as well. However, for future benefit, it is our opinion that under the facts of this case the trial court was well within its authority to impute a quantum of unreported-tips income to appellant.

Next, appellant claims that the trial court erred in making an unequal division of property. However, a trial court has broad powers to distribute property in order to achieve an equitable distribution. *Hodges v. Hodges,* 27 Ark.App. 250, 770 S.W.2d 164 (1989). The overriding purpose of the property-division statute is to enable the court to make a division of property that is fair and equitable under the circumstances. *Hoover v. Hoover,* 70 Ark.App. 215, 16 S.W.3d 560 (2000). A trial court's unequal division of marital property will not be reversed unless it is clearly erroneous. *Id.* at 218, 16 S.W.3d at 562. A trial court's finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Lammey v. Eckel,* 62 Ark.App. 208, 970 S.W.2d 307 (1998). In reviewing a trial court's findings, we defer to the court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Jennings v. Burford,* 60 Ark.App. 27, 958 S.W.2d 12 (1997).

Arkansas Code Annotated section 9–12–315 governs the division of marital property and provides in relevant part:

(a) At the time a divorce decree is entered:

(1)(A) All marital property shall be distributed one-half (1/2) to each party unless the court finds such a division to be inequitable. In that event the court shall make some other division that the court deems equitable taking into consideration:

(i) The length of the marriage;

(ii) Age, health, and station in life of the parties;

(iii) Occupation of the parties;

(iv) Amount and sources of income;

(v) Vocational skills;

(vi) Employability;

(vii) Estate, liabilities, and needs of each party and opportunity of each for further acquisition of capital assets and income;

(viii) Contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker; and

(ix) The federal income tax consequences of the court's division of property.

(B) When property is divided pursuant to the foregoing considerations the court must state its basis and reasons for not dividing the marital property equally between the parties, and the basis and reasons should be recited in the order entered in the matter.

(2) All other property shall be returned to the party who owned it prior to the marriage unless the court shall make some other division that the court deems equitable taking into consideration those factors enumerated in subdivision (a)(1) of this section, in which event the court must state in writing its basis and reasons for not returning the property to the party who owned it at the time of the marriage.

While the statute requires the trial court to consider certain factors and to state the basis for an unequal division of marital property, a plain reading shows that it does not require the court to list each factor in order to weigh all factors equally. *Keathley v. Keathley,* 76 Ark.App. 150, 61 S.W.3d 219 (2001). Further, the specific enumeration of these factors does not preclude a court from considering other relevant factors, where exclusion of other factors would lead to absurd results or deny the intent of the legislature to allow the trial court to make an equitable division of property. *Stover v. Stover,* 287 Ark. 116, 696 S.W.2d 750 (1985). Rather, where it is clear upon de novo review that the trial court considered the relevant factors, this court should affirm. *Keathley,* 76 Ark. App. at 157–59, 61 S.W.3d at 224–25.

Here, appellant complains that in addition to one-half of the marital assets, appellee was awarded a Pinnacle Country Club membership, a Disney timeshare, and the household furnishings, which together constituted an "unequal" division. However, the record does not establish the value—if any—of these items. As such, we are unable to adequately consider the matter on appeal. We reverse and remand the trial court's division of marital property with instructions to determine if these items have any real or intrinsic value. Furthermore, if they do, we ask the trial court to make the appropriate (and statutorily mandated) findings to support its unequal distribution of marital assets. Additionally, although reversing and remanding for further findings, we note that we are not persuaded that appellant is conferred any special, separate, or exclusive interest in the parties' University of Arkansas football tickets based on his status as a university letterman.

Finally, the awards of attorney's fees and expert-witness fees are questioned. The trial court may award attorney's fees to either party and will consider an award of additional fees should one party have to return for the enforcement of alimony, maintenance, and support provided for in the decree. Ark.Code Ann. § 9–12–309 (Repl.1998). Under this statute, a trial court has considerable discretion to award attorney's fees in a divorce case. *Gavin v. Gavin,* 319 Ark. 270, 890 S.W.2d 592 (1995). However, in determining whether to award attorney's fees, the court must consider the relative financial abilities of the parties. *McKay v. McKay,* 340 Ark. 171, 183, 8 S.W.3d 525, 532 (2000).

In this case, the evidence showed that appellant paid his attorneys from the account of the marital business. The largest portion of the amount was paid in cash. The attorney-fee award to appellee was less than half the amount that appellant expended from the marital-business account. Further, there is ample testimony of income disparity and earning power. As such, we see no abuse of discretion in

the trial court's award to appellee of a partial attorney's fee of $12,000.

██ ₁₁Likewise, the trial court did not abuse its discretion in awarding appellee a partial expert-witness fee of $4500. This decision was predicated on the fact that an accounting had to be undertaken because appellant failed to keep proper business records that had to be reconstructed for trial. Further, the testimony showed that the marital-business funds were used for both business-related expenses and for divorce expenses. Because we see no abuse of discretion, we affirm the expert-witness fee award.

Affirmed in part; reversed and remanded in part.

PITTMAN and BROWN, JJ., agree.